1

2

3

4

5

6
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
7                              AT TACOMA

8    BRIAN TOFTE; CYNTHIA ALDERETTE;          Case No. 3:22-cv-05700-TMC

9    MICHAEL T SMITH,                         ORDER ON DEFENDANTS' MOTION
                                              FOR SUMMARY JUDGMENT
10                          Plaintiffs,

11          v.

12   CITY OF LONGVIEW; ROBERT HUHTA;

13   JORDAN SANDERS; MATT HARTLEY;

14   JOHN REEVES; JOHN AND JANE DOES

15   1-10,

16                          Defendants.

17

## I.    INTRODUCTION
18
           Justin Tofte was killed by police in Longview, Washington on October 2, 2020.[1]
19
20   Detective Matt Hartley, a Longview officer, had seen Tofte driving in Longview that day and

21   attempted to pull him over for an active warrant. Officers pursued Tofte, at first in their cars and

22   then on foot. An attempt to tase him in an alleyway failed, and eventually Detective Hartley and

23   _____
     [1] Justin Tofte's father, Brian Tofte, is a plaintiff. Since the Court only discusses Justin for the rest
24   of this order, the Court will refer to Justin as "Mr. Tofte" or "Tofte."

Detective Jordan Sanders chased Tofte into an opening between a group of buildings and a parking lot. A surveillance camera from one nearby building captured Tofte tripping and falling forward as he ran from the officers, while a small black object fell out of his pocket and skidded across the pavement in front of him. Tofte then began to get back up but fell forward towards the object, landing on the ground near it.

Around this time, Detective Sanders shot Mr. Tofte. Tofte at first continued to run but eventually surrendered and died from the gunshot wound. The parties dispute the circumstances surrounding the shooting, including when exactly Sanders shot Tofte and what Tofte was doing as Sanders fired. These genuine factual disputes are material to whether the shooting violated Tofte's clearly established constitutional rights and must be resolved by a jury. For the reasons explained further below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

## II.    BACKGROUND[2]

On October 2, 2020, Defendant Matt Hartley, a detective with the Longview Police Department's ("LPD") Street Crimes Unit ("SCU"), saw Mr. Tofte driving in the Highlands neighborhood in Longview. *See* Dkt. 30 at 193. Detective Hartley, who was in the neighborhood "looking for wanted subjects," had "seen photographs" of Tofte and called the "records department" for a warrants check. *See id.* at 192–93. Detective Hartley received a response that Tofte had a warrant for his arrest and that his driving status was suspended. *See id.* at 193. Hartley called Defendant Jordan Sanders, another SCU detective, to help him apprehend Tofte.

---

[2] The facts as recounted in this section are based on the parties' evidence, including video footage, viewed in the light most favorable to Mr. Tofte and drawing all reasonable inferences in his favor. This section also details the testimony of the officer who shot Tofte, which, as the Court explains later, is not necessarily assumed to be true even if uncontradicted in a case involving deadly force.

*Id.* at 98. Detective Sanders testified that he had previously "heard" from informants that Tofte had committed robberies with firearms, was "likely possibly in possession of a firearm," and was a person of interest in multiple shootings. *Id.* at 99; *see also id.* (Sanders's testimony confirming that he was "aware" of this information "prior to going out to the scene").[3]

When Detective Sanders arrived in the area, he saw Mr. Tofte driving past him in the opposite direction. *See id.* at 101. Sanders did a "u-turn" to follow Tofte, but Tofte "fled" at high speed, causing Sanders to lose track of him. *See id.* at 101–02. The officers continued to search for Tofte and eventually found him standing outside of his car. *Id.* at 103. Sanders drove towards Tofte, who ran away. *See id.* Detectives Sanders and Hartley at first followed Tofte in their cars and Sanders tried to "corral" or pull in front of him, but Tofte avoided him. *Id.* at 105–06. When Tofte stopped in front of a fence, the officers exited their cars, but Tofte kept running. *Id.* at 106.

The officers chased Mr. Tofte on foot into an alleyway, where Detective Sanders tased him. *Id.* at 108. According to Sanders, during most of the pursuit, the officers were about twenty feet behind Tofte but were about ten feet behind when Sanders tased him. *Id.* at 126–27. Sanders

---

[3] Plaintiffs emphasize Detective Sanders's earlier deposition testimony that he discussed the possibility that Tofte had a firearm with Detective Hartley when they were in "the field," and not when Sanders "was still in the office," *see* Dkt. 38 at 4 (citing Dkt. 36-1 at 20–21), and that he and Hartley also "talked [about Tofte] later," Dkt. 38 at 4 (citing Dkt. 36-1 at 20-21). This testimony immediately preceded Sanders's testimony, cited above, that he was aware of information about Tofte's alleged possession and use of firearms in the commission of crimes "prior to going out to the scene." Plaintiffs submit that Sanders's earlier testimony makes it unclear whether he knew this information before encountering Tofte, especially when viewing the evidence in the light most favorable to them. Dkt. 38 at 4. The Court disagrees; Sanders responded in the affirmative to Plaintiffs' counsel's question asking whether he knew specific information about Tofte "prior to going out to the scene." *See* Dkt. 30 at 99. That he may have also discussed Tofte's history with Hartley after the incident does not undermine this testimony. The rule that the Court views evidence in the light most favorable to the non-movant does not authorize it to ignore unambiguous evidence that is not genuinely disputed. *L.F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020) ("[A] court's obligation at the summary judgment stage to view the evidence in the light most favorable to the non-movant does not require that it ignore undisputed evidence produced by the movant.").

testified, and video footage confirms, that before he was tased Tofte was running with his right hand in the front pocket of his jacket. Dkt. 36-5a at 0:11–0:49. From Sanders's perspective: "[Mr. Tofte] had his right hand concealed in his pocket, like he was not letting—not wanting something to fall out." Dkt. 30 at 109. When Sanders tased Tofte, he fell forward to the ground (facing away from the officers), and briefly turned onto his back, at which point he was looking at the officers—while keeping his right hand either in or close to his jacket pocket—before quickly returning to his feet, turning back around, and continuing to run. *See* Dkt. 36-5a at 0:48–0:54. Sanders says he had commanded Tofte to "stop running" from the beginning of the chase. *See* Dkt. 30 at 351–52.

After being tased, Mr. Tofte kept running down the alley away from the officers and, about five seconds later while running alongside some parked cars, tripped and fell forward onto the ground. *Id.* at 113; Dkt. 36-5a at 1:06–1:12. As he did so, a small black object, which Detective Sanders perceived to be a "small . . . pistol," fell out of what appears to be Tofte's pocket and skidded in front of him (the direction he was running) across the pavement. *See* Dkt. 30 at 113; Dkt. 36-5a at 1:12–1:13. Detective Hartley, however, testified that he did not see a gun at that point. Dkt. 36-3 at 13.[4]

Mr. Tofte then started to stand up, but, before fully standing, either fell or lunged in the direction of the black object (away from the officers) and fell on or close by it. *See* Dkt. 36-5a at 1:13–1:17. According to his deposition testimony, when Detective Sanders saw the object fall out of Tofte's pocket, he moved to the right (but still behind) Tofte so he could observe him from "a different angle" and commanded him "to stay where he was at [and] to put his hands behind

---

[4] Detective Hartley did not see Mr. Tofte's gun until they located him wounded later in the chase. *See* Dkt. 36-3 at 13.

his back." Dkt. 130 at 113. Then, according to Sanders, Tofte "[got] up and pick[ed] up the firearm." *Id.* at 114.

Detective Sanders then shot Mr. Tofte. *See id.* at 118. According to his deposition testimony, Sanders fired two shots "in quick succession" as Tofte was reaching for and picking up what Sanders perceived to be the gun that fell out of his pocket after falling or lunging towards it. *See id.* at 115–16 ("I remember pulling the trigger when [Tofte] was reaching and picking up the firearm."); *see also id.* at 118. The video evidence, however, is inconclusive as to when Sanders fired. At this point, the parties were far from the surveillance camera, and the video does not contain any movement from Tofte or Sanders that clearly shows Sanders firing his weapon or Tofte being hit.[5] But around four seconds after Tofte got off the ground and continued running away, the video shows a change in the hue of a car window behind where Tofte was running. A reasonable juror could find the change shows the window breaking. *See* Dkt. 36-5a at 1:23–25. Plaintiffs have also submitted a close-up picture of what looks like the same car with a shattered window on its right side (the side Sanders was facing while pointing his gun at Tofte):



---

[5] Surveillance footage from nearby businesses supply the only video evidence.

Dkt. 36-23 at 2. Assuming the truth of Sanders's testimony that he fired two shots "in quick succession," a jury could find Sanders did not fire until around four seconds after Tofte resumed running away after falling (and possibly picking up a dropped gun). Over the course of those four seconds, and soon thereafter, the officers are seen slowly walking backwards as they are aiming their guns at Tofte, and Tofte does not turn and face them. Dkt. 36-5a at 1:18–1:24.

Detectives Sanders and Hartley continued to chase Mr. Tofte and located him sitting on the ground holding a gun. *See* Dkt. 30 at 353. Tofte followed commands to drop the gun and officers handcuffed him. *See* Dkt. 30 at 288–290. Despite medical aid, Tofte died of a gunshot wound which entered in the "right posterior axillary / lateral scapular region" (roughly speaking, under the back of the right shoulder) and coursed "from back to front and right to left." *See* Dkt. 36-7 at 5–6.

Plaintiffs are Brian Tofte and Cynthia Alderette—Mr. Tofte's parents—and Michael T. Smith, the personal representative of Mr. Tofte's estate. Dkt. 1 ¶¶ 7–9. Plaintiffs brought this lawsuit on September 20, 2022 against Defendants Sanders, Hartley, the City of Longview, Robert Huhta (interim chief of the Longview Police Department), John Reeves (a Longview police sergeant), and Defendants John Does 1–10 (unidentified "employees and/or agents of LPD"). Dkt. 1 ¶¶ 1–6. The complaint raises claims under 42 U.S.C. § 1983 against all Defendants for excessive force in violation of the Fourth Amendment and deprivation of familial relationship in violation of the Fourteenth Amendment, and Washington state law claims for negligence against all Defendants and assault and battery against Defendants Sanders and the City of Longview.

On July 24, 2024, Defendants moved for summary judgment on all of Plaintiffs' claims. Dkt. 29. The motion was noted for consideration on August 21, 2024. It is fully briefed and ripe for the Court's consideration.

1

2

### III.    DISCUSSION

**A.    Legal Standards**

3

4

5

6

7

8

9

10

11

12

13

14

15

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

16

17

18

19

20

21

22

23

24

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Generally, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Consequently, in ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party . . . ." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

**B.    Analysis**

*1.       Fourth Amendment – Excessive Force*

The individual Defendants argue that they are entitled to qualified immunity for the Estate's Fourth Amendment excessive force claim. Dkt. 29 at 14–20. Plaintiffs concede that Defendants Hartley, Reeves, and Huhta are entitled to qualified immunity for the Fourth Amendment claim. Plaintiffs instead argue that Reeves and Huhta are "liable as supervisors and policymakers[.]" Dkt. 38 at 17 n.66. Plaintiffs agree to dismiss Detective Hartley as a defendant in his personal capacity. *Id.* The Court grants Defendantss motion for this claim as to Hartley, Reeves, and Huhta and dismisses the Fourth Amendment claim against them.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts follow a "two-step sequence" to analyze qualified immunity defenses:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted). Which step to analyze first is an exercise of discretion "in light of the circumstances in the particular case at hand." *Id.* at 236. The Court begins at the first step.

*a.   Whether Detective Sanders's Deadly Force was Reasonable*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "A police officer's use of deadly force against a person

constitutes a seizure within the meaning of the Fourth Amendment," and such "a seizure violates the Fourth Amendment when it is objectively unreasonable." *Calonge v. City of San Jose*, 104 F.4th 39, 45 (9th Cir. 2024) (first citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); then citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

To determine "reasonableness," courts must "careful[ly] balance[e] . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 397 (internal quotation marks omitted) (citations omitted). "Stated another way, [courts] must 'balance the amount of force applied against the need for that force.'" *Calonge*, 104 F.4th at 45 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010)). "An officer's use of *deadly* force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Garner,* 471 U.S. at 3); *see also Calonge*, 104 F.4th at 45 ("'The intrusiveness of a seizure by means of deadly force is unmatched' because of a person's 'fundamental interest in his own life.'" (quoting *Garner*, 471 U.S. at 9)).

Courts must determine whether, viewing the facts in the light most favorable to the plaintiffs, "the officers' conduct was reasonable using the Supreme Court's *Graham v. Connor* factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) (quoting 490 U.S. 386, 396 (1989)). The immediate threat prong is the "most important factor." *Calonge*, 104 F.4th at 45 (citations omitted). But this test is not exhaustive, and courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826

(quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela* v. *Hughes*, 584 U.S. 100, 103 (2018) (per curiam) (cleaned up).

Courts evaluate the use of deadly force by a police officer on a "spectrum" of reasonableness. *See Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023); *id.* ("While necessarily a fact-bound question with no per se rules, . . . prior [Ninth Circuit] decisions offer some guidance in evaluating the reasonableness of lethal force in response to a threat."). "At one end of the spectrum, when a suspect points a gun in an officer's direction, the Constitution undoubtedly entitles the officer to respond with deadly force." *Id.* (internal quotation marks omitted) (citations omitted). But officers don't necessarily "have to wait until a gun is pointed at [them] before [they are] entitled to take action." *Id.* (quoting *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001)). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

At the other end of the spectrum, "the Constitution does not tolerate the use of lethal force to seize an unarmed, nondangerous suspect by shooting him dead in the absence of probable cause of a threat of serious physical harm." *Id.* at 621 (internal quotations omitted) (citations omitted). And a suspect merely being armed, on its own, does not justify the use of deadly force. *See Calonge*, 104 F.4th at 48 ("We have held over and over that a suspect's possession of a gun does not itself justify deadly force.").

When considering a summary judgment motion, the Court must decide not where on this spectrum the Court believes Detective Sanders's conduct falls, but whether a reasonable jury

1    could find that Sanders's use of deadly force was unreasonable. The Court must view the

2    evidence in the light most favorable to Plaintiffs and draw all reasonable inferences in their

3    favor. The "analysis is not static, and the reasonableness of force may change as the

4    circumstances [confronting the officers] evolve." *Est. of Strickland*, 69 F.4th at 620. When there

5    is video evidence in the record, courts "should . . . view[] the facts in the light depicted by the

6    videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

7            Unsurprisingly, the Ninth Circuit has reiterated time and again that the reasonableness of

8    deadly force is a fact-intensive question often unsuitable for determination on summary

9    judgment. *See, e.g.*, *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) ("The

10   reasonableness standard nearly always requires a jury to sift through disputed factual

11   contentions, so summary judgment in an excessive-force case should be granted sparingly."

12   (internal quotation marks and citation omitted). This too is such a case.

13           Viewing the evidence in the light most favorable to Mr. Tofte, a reasonable juror could

14   find that the car window breaking behind him four seconds after he resumes running away is

15   persuasive evidence of when Detective Sanders fired his weapon. Combined with Sanders's

16   testimony that he fired two shots "in quick succession," a reasonable juror could find that the

17   first shot was fired around four seconds after Tofte resumed running from the officers after

18   falling. Based on the record presented to the Court, there does not appear to be any clear

19   evidence from the video of Sanders firing his weapon before that point.

20           And while Plaintiffs' evidence on this point is weaker, a reasonable juror could also

21   question whether the object that fell out of Mr. Tofte's pocket was a gun (and whether Detective

22   Sanders's testimony that he saw a gun is correct). Despite Defendants' contentions to the

23   contrary, it is unclear from the video what the object was. Although Sanders testified that he

24   perceived the object to be a small black handgun—like the one Tofte was found with a few

minutes later when he surrendered—Detective Hartley, who was standing right beside him, testified that he did not see a gun at any time before Tofte was shot. Dkt. 30 at 113; Dkt. 36-3 at 13. The Court must resolve this discrepancy in Plaintiffs' favor in deciding this motion. *See George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (citations omitted) ("In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died, our precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement."); *Calonge*, 104 F.4th at 44 (applying evidentiary rules for deadly force cases and assuming that the victim of a fatal police shooting did not "draw[] his gun or otherwise making a threatening gesture" where the officer who shot him "observed [the victim's] elbow move away from his body" but other officers who "were also watching [the victim] at the time . . . saw no such movement").

Taken together, a jury could find that—even if Detective Sanders reasonably believed that Mr. Tofte might be armed, based on his prior knowledge and Tofte's concealment of his hand—the object that fell from Tofte's pocket was not his gun, Tofte did not make any furtive movements with a weapon, and Sanders fired while Tofte was running away. *See Banks v. Mortimer*, 620 F. Supp. 3d 902, 927 (N.D. Cal. 2022) ("a reasonable jury could doubt critical elements of" a defendant officer's testimony in part because "[t]he security camera footage [was] inconclusive" and the testimony of the officer who shot the victim was "inconsistent").

The Ninth Circuit's decision in *George v. Morris* is instructive. There, defendant police officers responding to a domestic disturbance call shot and killed a sixty-four-year-old man standing on his porch with a walker and a handgun pointed down towards the ground. *George*, 736 F.3d at 839. In evaluating the reasonableness of the officers' conduct, the court emphasized the fact that the victim, despite holding a gun and facing the officers, was not pointing it at them

or making other "furtive" or threatening movements. *See id.* at 838–39. And, as here, the officers in that case had reason to believe the victim was armed going into the situation based on the 911 call they received. *Id.* at 831. The court distinguished the case from those finding constitutionally valid uses of deadly force where "an individual points his gun *in the officers' direction*," or where a victim "held a 'long gun' and *pointed it at*" officers. *See id.* at 838 (emphasis added) (internal quotation marks omitted). The court concluded: "If the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment." *Id.* at 839. A reasonable jury here could similarly decide that Mr. Tofte did not pose sufficient danger to the officers, despite their suspicion that he may have had a gun, while he was running away from them for several seconds, not turning around, and not reaching for his pocket. *See also id.* at 838 (noting that the officers' conduct was unconstitutional despite the "potentially volatile and dangerous situation these deputies confronted").

Moreover, even if a reasonable jury believed that Mr. Tofte's conduct earlier in the chase entitled Detective Sanders to use deadly force, the same jury could still find that, by the time Sanders fired at Tofte (several seconds after he resumed running away), the danger had "waned" enough that deadly force was no longer reasonable. *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) ("As the situation evolved, however, the justification for the use of force waned.").

Of course, it would also be reasonable for a jury to conclude that Detective Sanders's version of events is correct, and that he shot Mr. Tofte as Tofte made a threatening movement to pick up a gun he had concealed throughout the chase, despite the officers' repeated commands and attempts to seize Tofte with non-lethal force. But the choice between these narratives requires weighing the evidence—scrutinizing the video, comparing it with the officers'

testimony and other physical evidence, and evaluating the officers' credibility. These tasks are for the jury, not the Court.

### b. Whether Mr. Tofte's Right to be Free from Excessive Force was Clearly Established

Next, the Court turns to whether Mr. Tofte's right to be free from excessive force was clearly established. While courts accept the "general rule prohibiting excessive force," *Saucier v. Katz*, 533 U.S. 194, 207–08 (2001), the inquiry is case-specific, requiring the Court to determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne*, 626 U.S. 603, 605 (1999)). The inquiry is also time-specific, requiring the Court to ask whether the right was clearly established when the incident occurred. *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002). It is the plaintiff's burden to show that the right was clearly established. *Id.* at 969.

The Court begins by looking to binding precedent. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). While courts do "not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). Generally, the Court "must 'identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment.'" *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition," *Rivas-Villegas*, 595 U.S. at 5 (internal quotation marks omitted), but "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela*, 584 U.S. at 105 (quoting *White*, 580 U.S. at 79).

This prong of the analysis presents "purely a question of law for the court to decide." *Gordon v. Cty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (citations omitted). In making its determination, as with the first prong, the Court resolves factual disputes in Plaintiffs' favor and views the evidence in the light most favorable to them. *See Mortimer*, 620 F. Supp. 3d at 929.

Plaintiffs are correct that, viewing the evidence as the Court must in this posture, Mr. Tofte's right to be free from deadly force was clearly established when he was shot. Plaintiffs point to *Morris* as one case supporting this conclusion. In *Estate of Aguirre*, the Ninth Circuit, in a prong-two analysis, drew from *Morris* the principle that deadly force is still unreasonable even when an officer "enter[s] a 'potentially volatile' situation" involving an armed suspect if there is no "objective provocation." 29 F.4th at 630 (quoting *George v. Morris*, 736 F.3d 829, 838-39 (9th Cir. 2013)); *see also Selto v. Clark Cnty.*, 2023 WL 6311284, at *6 (W.D. Wash. Sept. 28, 2023) ("Here, it is undisputed that Peterson was armed, and there is no evidence on the record to contradict Defendants' testimony that Peterson had the gun in his hand at some point. However, at the time of the shooting, caselaw would have made it "clear to a reasonable officer" that "a police officer may not use deadly force against a non-threatening individual, *even if the individual is armed*, and even if the situation is volatile." (citing *Est. of Aguirre*, 29 F.4th at 629 and noting its citation to *Morris*, 736 F.3d at 832–33), *aff'd sub nom. Selto v. Cnty. of Clark*, No. 23-2531, 2024 WL 3423717 (9th Cir. July 16, 2024).

Plaintiffs also cite *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). As another court in the Ninth Circuit noted in relying on *Curnow* when deciding the "clearly established" prong, the "principle" from that case is "that police officers may not use deadly force on a suspect that is not facing them and does not threaten them with a weapon, even if the suspect has a weapon within reach." *Mortimer*, 620 F. Supp. 3d at 930.

These cases, both published before the shooting of Mr. Tofte, are enough to have put Detective Sanders on notice that using deadly force on a suspect who is running away, not facing officers, and not making threatening gestures is unconstitutional. The Court decides prong two in favor of Mr. Tofte.

Having decided that both prongs favor Mr. Tofte, the Court declines to grant summary judgment to Defendant Sanders on the Fourth Amendment claim. That said, because the Court's decision for both prongs of the analysis is based on disputed facts, Defendants may still raise their qualified immunity defense at trial. *See Selto*, 2023 WL 6311284, at *7.

2.      Monell *Liability – Defendant City of Longview*

Section 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Yet *Monell* also "held that municipalities are 'persons' subject to damages liability under section 1983 where 'action pursuant to official municipal policy of some nature causes a constitutional tort.'" *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (quoting *Monell*, 436 U.S. at 691). "[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694); *see Mohamed Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 885 (9th Cir. 2022) ("Under *Monell*, plaintiffs suing a municipal entity for damages under 42 U.S.C. § 1983 'must show that their injury was caused by a municipal policy or custom.'" (quoting *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 30–31 (2010)). This includes "both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)); *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted) (after proving circumstances showing

ratification, "a plaintiff must also show that the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation").

Plaintiffs bring a *Monell* claim against the City of Longview under one of the three recognized theories of *Monell* liability: ratification. *See Gillette*, 979 F.2d at 1346–47. Under this theory, "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "[A] single incident causally related to the constitutional deprivation may be sufficient for liability to attach" for a ratification claim. *Trevino*, 99 F.3d at 918 n.2 (citations omitted). But "[r]atification requires, 'among other things, knowledge of the alleged constitutional violation.'" *Mohamed Sabra*, 44 F.4th at 885 (quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)). "The mere fact that an officer was not reprimanded or provided with additional training cannot support a theory of ratification." *German v. Roberts*, No. C15-5237 BHS-DWC, 2017 WL 6547472, at *2 (W.D. Wash. Dec. 22, 2017) (first citing *Morales v. Fry*, C12-2235-JCC, 2014 WL 1230344, at *14 (W.D. Wash. Mar. 25, 2014); then citing *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253–54 (9th Cir. 2010)).

As its sole evidence supporting this theory, Plaintiffs point to Chief Huhta and Sergeant Reeves's deposition testimony that they "approved of the actions of [their] subordinates." *See* Dkt. 38 at 23–24 (first citing Dkt. 36-10 at 5; then citing Dkt. 36-11 at 7–8). But this evidence does not show that these approvals caused the constitutional violations at issue. *See Harris*, 489 U.S. at 389; *Gravelet-Blondin*, 728 F.3d at 1096; *Mohamed Sabra*, 44 F.4th at 885. Consistent with the causation requirement, the Ninth Circuit has treated a failure to show that policymakers knew of the alleged constitutional violations "*before* the alleged constitutional violations ceased" as sufficient reason to grant summary judgment on a ratification claim. *See Christie*, 176 F.3d at 1239 (emphasis added); *see also Mueller v. Cruz*, No. SA CV 13-01274-CJC, 2015 WL

9455565, at *3 (C.D. Cal. Dec. 23, 2015) ("Here, Mueller has not alleged that any policymaker acted or was aware of a policy or culture of acceptance of illegal force such as that allegedly used by Cruz . . . 'before the alleged constitutional violations ceased.' . . . Rather, Rackauckas and Hutchens exonerated Deputy Cruz *after* the alleged use of excessive force." (emphasis added) (quoting *Christie*, 176 F.3d at 1239)).

Plaintiffs' citation to *Larez v. Los Angeles*, 946 F.2d 630 (9th Cir. 1991) does not support their position. As other courts have explained, that case held that a police chief's "acceptance of an obviously flawed investigation constituted evidence of a *pattern and practice* of condoning police abuse." *Cole v. Doe I thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005) (emphasis added). Without any evidence (or explanation) of causation, Plaintiffs have not shown a genuine dispute of material fact on their *Monell* claim.

### 3.    Supervisory Liability – Defendants Reeves and Huhta

Plaintiffs also bring supervisory liability claims against Chief Huhta and Sergeant Reeves. "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others." *Larez*, 946 F.2d at 646 (cleaned up). As explained in *Larez*:

> A supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury. Yet, this does not prevent a supervisor from being held liable in his individual capacity. Like the officers, Gates's individual liability hinges upon his participation in the deprivation of constitutional rights. But unlike the officers' involvement, which ordinarily is direct and personal, his participation may involve the setting in motion of acts which cause others to inflict constitutional injury.

*Id.* at 645. (citing *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly

refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (cleaned up); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if [he] participated in or directed the violations, or knew of the violations and failed to act to prevent them.").

Plaintiffs argue that "Defendants Huhta and Reeves ratified the unconstitutional conduct of subordinates or were responsible for unconstitutional *Monell* policies or customs." Dkt. 38 at 24. Yet "neither the Supreme Court nor our circuit has established that an official's post-incident ratification of or acquiescence to a claimed constitutional violation is alone sufficient for individual liability under § 1983." *Hunt v. Davis*, 749 F. App'x 522, 525–26 (9th Cir. 2018). Plaintiffs do not point to any evidence that Chief Huhta or Sergeant Reeves set in motion a series of acts that led to Detective Sanders's conduct or that they were aware of similar ongoing constitutional violations that they failed to act to prevent before Mr. Tofte's shooting. *See id.* at 525 (citations omitted) ("[A]llegations of knowledge of ongoing wrongdoing and a subsequent failure to intervene are required."); *cf. Starr*, 652 F.3d at 1216 (plaintiff plausibly alleged supervisory liability based on failure to address ongoing constitutional violations when the defendant "took no action to stop his subordinates' repeated violations of prisoners' constitutional rights despite being repeatedly confronted with those violations").

Moreover, if Plaintiffs mean to incorporate their discussion from the background section of their brief regarding a prior incident where Detective Sanders shot and killed someone, *see* Dkt. 38 at 14–15, they have not provided any argument or authority for how the cited evidence establishes either individual supervisory or *Monell* liability. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) ("Parties represented by competent counsel . . . are responsible for

advancing the facts and argument entitling them to relief." (cleaned up)); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted) ("We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."). Summary judgment is granted as to Plaintiffs' supervisory liability claims against Chief Huhta and Sergeant Reeves and their *Monell* claims.

4.    *Fourteenth Amendment - Deprivation of Familial Relationship*

Defendants also move for summary judgment on Plaintiffs Brian Tofte and Cynthia Alderette's Fourteenth Amendment familial deprivation claim on the grounds that the claim is legally invalid and, in the alternative, that Defendants are entitled to qualified immunity.

The Court can quickly dispose of Defendants' argument that *Graham v. Connor* foreclosed Fourteenth Amendment substantive due process claims based on excessive force of law enforcement brought by family members of the victim, as the Ninth Circuit has rejected this exact argument. *See Curnow*, 952 F.2d at 325. Parents and children may bring this claim for "loss of the companionship and society of his or her child, or vice versa." *Id.*

The Court concludes, however, that Defendants are entitled to qualified immunity under the higher standard for these claims, which requires a showing of "[o]fficial conduct that 'shocks the conscience.'" *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter v. Osborn*, 546 F.3d, 1131, 1137 (2008)). "Conscience-shocking actions are those taken with (1) 'deliberate indifference' or (2) a purpose to harm . . . unrelated to legitimate law enforcement objectives. . . . The lower 'deliberate indifference' standard applies to circumstances where actual deliberation is practical." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013) (first citing *Porter*, 546 F.3d at 1137; then citing *Wilkson*, 610 F.3d at 554).

As to the second prong of the qualified immunity analysis, Plaintiffs point to *A.D.* for the proposition that "a police officer, who act[s] with the purpose to harm a civilian unrelated to [a]

legitimate law enforcement objective, . . . violates the rights protected by the Fourteenth Amendment due process clause" and that it is clearly established that acting with such a purpose violates due process, even without a case on point. *Id.* at 454. But *A.D.* was an appeal of a motion for judgment as a matter of law after trial where the jury had found that the officer had a subjective purpose to cause the victim's death unrelated to a legitimate law enforcement purpose. *Id.* at 454 ("[B]ecause we are confined to the jury's factual finding that Markgraf acted with a purpose to cause Eklund's death unrelated to any legitimate law enforcement objective, we are essentially compelled to deny Markgraf qualified immunity."). In this posture, the Court cannot assume a similar conclusion, and Plaintiffs have not pointed to any analogous cases in which courts have found that shooting a suspect who is reasonably suspected to have a gun during a chase, even as they are running away, shows a purpose to harm unrelated to any legitimate law enforcement objective. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998), *as amended* (Nov. 24, 1998) ("[I]t may be possible for an officer's conduct to be objectively unreasonable yet still not infringe the more demanding standard that governs substantive due process claims.") (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 855 (1998). Because Plaintiffs have not met their burden on the second prong, the Court grants Defendants' motion as to the Fourteenth Amendment claim.

### 5.    *Negligence*

Defendants move for summary judgment on Plaintiffs' state law negligence claim on the grounds that "Plaintiffs fail to identify any common law duty that was breached by the defendants, or an exception to the public duty doctrine" and that the claim is barred by the felony bar statute, RCW 4.24.420. Dkt. 29 at 26. Because Plaintiffs have not met their burden at summary judgment to proceed with their negligence claim, the Court need not address the felony bar statute.

1   "The public duty doctrine recognizes that governments, unlike private persons, are tasked

2   with duties that are not actionable duties within the meaning of tort law." *Beltran-Serrano v.*

3   *Tacoma*, 193 Wn.2d 537, 549, 442 P.3d 608 (2019). "[A] city's statutorily imposed obligation to

4   provide police services, enforce the law, and keep the peace" are "statutory duties [that] have

5   always been, and will continue to be, nonactionable duties owed to the public at large." *See id.* at

6   552.

7       Even so, the common law duty of reasonable care to "refrain from causing foreseeable

8   harm in interactions with others . . . applies in the context of law enforcement and encompasses

9   the duty to refrain from directly causing harm to another through affirmative acts of

10  misfeasance." *Id.* at 550 (citations omitted). Under Washington law, "governmental entities

11  'shall be liable for damages arising out of their tortious conduct . . . to the same extent as if they

12  were a private person or corporation.'" *Norg v. City of Seattle*, 200 Wn.2d 749, 756, 522 P.3d

13  580 (Wash. 2023) (quoting RCW 4.96.010(1)). Thus, Plaintiffs may bring negligence claims

14  against police officers that "arise out of [an officer's] direct interaction with [the plaintiff], not

15  the breach of a generalized public duty." *See Beltran-Serrano*, 193 Wn.2d at 551. On the other

16  hand, "[i]f the duty that the government allegedly breached was owed to the public at large, then

17  the public duty doctrine applies," in which case "the negligence claim must be dismissed for lack

18  of an actionable duty unless there is an applicable exception." *Norg*, 200 Wn.2d at 758. "Thus, to

19  determine whether the public duty doctrine bars the [plaintiffs'] claim, . . . [the Court] must

20  identify the duty that the [Defendants] allegedly breached and determine whether that duty is

21  based on a generally applicable statute or an individually applicable common law duty." *Id.* at

22  759. This is a question of law for which the plaintiff bringing the negligence claim bears the

23  burden. *See id.*; *Beltran-Serrano*, 193 Wn.2d at 549 ("To establish a duty in tort against a

24

governmental entity, *a plaintiff must show* that the duty breached was owed to an individual and was not merely a general obligation owed to the public." (emphasis added)).

Defendants move for summary judgment on the ground that Plaintiffs' negligence claim is not based on a legitimate, non-public duty that the officers owed to Mr. Tofte. In *Beltran-Serrano*, the Washington Supreme Court found that a negligence claim arising from a police shooting of the plaintiff was viable, and not barred as a public duty claim, in part because it was based on the officer's decision to prevent the plaintiff from "walking away" and the officer's "lack of adequate training." *See Beltran-Serrano*, 193 Wn.2d at 544; *see also id.* ("The core of his negligence claim is that Officer Volk unreasonably failed to follow police practices calculated to avoid the use of deadly force."). The claim was not based on a "negligent intentional shooting," but "require[d] consideration of the totality of the circumstances involved in the encounter between Officer Volk and Beltran-Serrano, and [identification of] potential negligence in the series of actions leading up to the decision to shoot." *Id.* at 545.

Plaintiffs' response provides only a conclusory argument that restates the general rule that "the public duty doctrine applies only to claims based on an alleged breach of special governmental obligations that are imposed by statute or ordinance, not common law negligence." *See* Dkt. 38 at 26 (cleaned up). Plaintiffs have not articulated the non-public duty owed to Mr. Tofte that supports their negligence claim or identified the evidence from which a trier of fact could conclude that duty was breached. Because Plaintiffs have not met their burden under Rule 56 to support essential elements of their claim, the Court grants summary judgment on their negligence claim.

### 6.   *Assault and Battery*

Defendants move for summary judgment on Plaintiffs' state law assault and battery claim. "Generally, a police officer making an arrest is justified in using sufficient force to subdue

a prisoner, however he becomes a tortfeasor and is liable as such *for assault and battery* if unnecessary violence or excessive force is used in accomplishing the arrest." *Boyles v. Kennewick*, 62 Wn. App. 174, 176, 813 P.2d 178 (1991). Defendants argue, in conclusory fashion, that Plaintiffs have failed to put forth evidence that meets this standard. *See* Dkt. 29 at 28; Dkt. 44 at 12. Washington courts have looked to the federal Fourth Amendment reasonableness standard for guidance in deciding common law assault and battery claims. *See Gallegos v. Freeman*, 172 Wash.App. 616, 641–42, 291 P.3d 265 (2013); *McKinney v. City of Tukwila*, 103 Wash.App. 391, 408, 13 P.3d 631 (2000). Therefore, for the reasons discussed in the section of this order addressing the Fourth Amendment claims, genuine issues of fact preclude summary judgment on this claim as well.

## IV.   CONCLUSION

For the reasons explained above, the Court ORDERS as follows:

1.    Summary judgment is GRANTED as to the Section 1983 claims against Defendants Huhta, Hartley, Reeves, and the City of Longview. These claims are DISMISSED with prejudice.

2.    Summary judgment is GRANTED as to the Fourteenth Amendment claim against Defendant Sanders. This claim is DISMISSED with prejudice.

3.    Summary judgment is DENIED as to the Fourth Amendment claim against Defendant Sanders.

4.    Summary judgment is GRANTED as to the negligence claim against the City of Longview. This claim is DISMISSED with prejudice.

5.    Summary judgment is DENIED as to the assault and battery claim against Defendants Sanders and the City of Longview.

6.    Plaintiffs are further ORDERED to show cause within fourteen days why the

Court should not dismiss the John Doe Defendants sua sponte, as Plaintiffs have

not put forward any evidence that they have ascertained the identity of more

defendants through discovery. *See Wakefield v. Thompson*, 177 F.3d 1160, 1163

(9th Cir. 1999).

Dated this 23rd day of September, 2024.

Tiffany M. Cartwright
United States District Judge